**H.D. CORP. OF PUERTO RICO and H.D. 65, Inc., Plaintiffs, Appellants,**

v.

**FORD MOTOR COMPANY and Ford Motor Company Caribbean, Inc., Defendants, Appellees.**

No. 85–1732.

United States Court of Appeals, First Circuit.

Argued Feb. 3, 1986.

Decided May 29, 1986.

J. Arthur Mozley with whom Robert M. Finlayson II, Deborah A. Finnerty, Atlanta, Ga., Nestor M. Mendez-Gomez, San Juan, P.R., Mozley, Finlayson & Anderson, Atlanta, Ga., and McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, P.R., were on brief for plaintiffs, appellants.

Pedro J. Santa-Sanchez with whom O'Neill & Borges, Hato Rey, P.R., was on brief for defendants, appellees.

Before CAMPBELL, Chief Judge, BREYER, Circuit Judge, and GIERBOLINI,[*] District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Plaintiffs-appellants H.D. Corp. of Puerto Rico and H.D. 65, Inc., appeal from a judgment of the United States District Court for the District of Puerto Rico dismissing their complaint against defendants-appellees Ford Motor Co. ("Ford") and Ford Motor Co. Caribbean, Inc. ("Ford Caribbean"). We consider in this appeal whether or not plaintiffs-appellants have succeeded in stating a claim under the federal Automobile Dealer's Day in Court Act, and, if not, whether the district court nonetheless should have retained diversity jurisdiction over their claims in contract against Ford Caribbean.

### I.

Plaintiffs alleged essentially the following in their amended complaint. Plaintiffs are Delaware corporations with their principal place of business in New York. They are successors-in-interest to Dobbs Houses, Inc., doing business through two (now defunct) Puerto Rico automobile dealerships, Hull Dobbs Co. of Puerto Rico ("Hull Dobbs") and Hull Dobbs 65th Infantry ("Hull Dobbs 65th"). Defendant Ford is a Delaware corporation with its principal place of business in Michigan. Defendant Ford Caribbean is a Puerto Rico corporation with its principal place of business in San Juan, Puerto Rico. Under 28 U.S.C. § 1332(c) (1982), there is diversity of citizenship only between the plaintiffs and defendant Ford Caribbean, because both the plaintiffs and defendant Ford are Delaware corporations.[1]

Until 1980, Dobbs Houses operated the Hull Dobbs and Hull Dobbs 65th dealerships pursuant principally to three different written agreements with defendant Ford.[2] In August of 1979, Hurricane David struck the San Juan area causing damage to the new Ford vehicle inventory at Hull Dobbs. Because of this, defendants voided the basic Ford warranties on these vehicles over Dobbs Houses' objection. In addition, defendants refused to pay Dobbs Houses certain "model closeout rebates" and "luxury car incentives" that were allegedly owing to Hull Dobbs under the dealership agreements.

Because of the hurricane damage caused to Hull Dobbs, and for other, unspecified reasons, Dobbs Houses entered into negotiations with Ford and Ford Caribbean to terminate the Hull Dobbs and the Hull Dobbs 65th dealership agreements. On July 9, 1980, the parties executed so-called termination and repurchase agreements for both dealerships. The termination and repurchase agreements each included (1) a letter by which Dobbs Houses voluntarily agreed to terminate its dealership agreements with defendants in consideration of Ford Caribbean's repurchasing certain new vehicles, parts and accessories, dealership signs, and tools and equipment in accordance with the terms of the "Puerto Rico Sales Agreements" between the parties;[3]

---

[*] Of the District of Puerto Rico, sitting by designation.

[1] Section 1332(c) provides in part that "a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business."

[2] See note 3, infra.

[3] The "Puerto Rico Sales Agreements" for Hull Dobbs and Hull Dobbs 65th represented the basic dealership agreements between Dobbs Houses and the defendants. Dobbs Houses and

and (2) a general release of certain of Dobbs Houses' claims against defendants.

The repurchase obligation in the voluntary termination letter for each dealership stated in relevant part,

> [Dobbs Houses' termination] offer is based on Ford Motor Company Caribbean, Inc.'s repurchasing:
>
> .　　.　　.　　.　　.
>
> (b) New Parts and Accessories—in accordance with the terms and conditions described in Paragraph 21(b) of the Puerto Rico Sales Agreement.[4]

Pursuant to this clause, Dobbs Houses attempted to return approximately $740,000 worth of Ford parts and accessories to defendants, but defendants refused to repurchase about $500,000 worth of these parts and accessories on the grounds that they were not in clean, unmarked original factory cartons labeled with current Ford part numbers.

The amended complaint is divided into nine counts, only two of which alleged violations of federal law. Count one alleges that defendants' refusal to repurchase the remaining $500,000 worth of parts and accessories from Dobbs Houses constituted an "arbitrary, unreasonable, coercive and discriminatory" breach of the termination and repurchase agreements for Hull Dobbs and Hull Dobbs 65th in violation of the federal Automobile Dealer's Day in Court Act (the "Dealer's Act"), 15 U.S.C. §§ 1221 et seq. (1982). Count seven alleges that defendants' withdrawal of warranty protection on the Hull Dobbs inventory and defendants' refusal to pay Dobbs Houses certain "model close-out rebates" and "luxury car incentives" violated defendants' duty under the Dealer's Act to act in good faith in performing or complying with the terms of the dealership agreements. The remaining counts of the complaint allege violations of the Puerto Rico Dealership Act, P.R. Laws Ann. tit. 10, §§ 278 et seq. (1976 & Supp.1984) and the common law of contracts.

On defendants' motion to dismiss, the district court dismissed counts one and seven on the ground that they failed to state claims for relief under the Dealer's Act. The court declined to exercise jurisdiction over the remaining commonwealth law counts on the ground that there was not complete diversity of citizenship between plaintiffs and defendants. This appeal followed.

## II.

The district court concluded that counts one and seven of the amended complaint

---

the defendants had also entered into an "Overseas Distributor Parts and Accessories Sales Agreement" and a "Puerto Rico Imported Vehicle Sales Agreement" in respect to both the Hull Dobbs and Hull Dobbs 65th dealerships.

4. Paragraph 21(b) of the Puerto Rico Sales Agreements for both Hull Dobbs and Hull Dobbs 65th provided,

Parts and Accessories.

(i) Each new, unused and undamaged part in the Dealer's stock and unsold by the Dealer on the effective date of such termination or expiration, provided such part is offered in the Company's then current Parts and Accessories Net Price List, is in first-class saleable condition and was purchased by the Dealer from the Company, or from another AUTHORIZED DEALER, prior to the time the Dealer first learned of the prospective termination or non-renewal.

(ii) Each new, unused and undamaged accessory in the Dealer's stock and unsold by the Dealer on the effective date of such termination or expiration, provided such accessory is in first-class saleable condition, was purchased by the Dealer from the Company, or from another AUTHORIZED DEALER, prior to the time the Dealer first learned of the prospective termination or non-renewal, and was sold by the Company for use in a VEHICLE of a model being offered for sale as a current model by the Company on such effective date of termination or expiration or was purchased from the Company within the twelve (12) month period preceding such date of termination or expiration.

.　　.　　.　　.　　.

(iv) The Dealer shall carefully pack and box, at the Dealer's expense, such parts and accessories to be reacquired by the Company or returned by the Dealer pursuant to this paragraph 21 as the Company may direct, and the Company shall pay the Dealer for such packing and boxing 5% of the EXPORT DEALER PRICE of the parts and accessories so packed and boxed in effect on the effective date of termination or expiration.

.　　.　　.　　.　　.

failed to state a claim under the Dealer's Act because neither count one nor count seven alleged any specific acts of actual coercive conduct by defendants. We agree.

The Dealer's Act creates a federal cause of action in an automobile dealer who is injured by reason of an automobile manufacturer's failure "to act in *good faith* in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with [the] dealer." 15 U.S.C. § 1222 (1982) (emphasis added). The term "good faith" is defined in 15 U.S.C. § 1221(e) (1982) as follows:

> The term "good faith" shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

We recently interpreted section 1221(e) in *Wallace Motor Sales, Inc. v. American Motor Sales Corp.,* 780 F.2d 1049 (1st Cir. 1985). We said,

> This is the first time the meaning of [section 1221(e) ] has come up for review in this circuit. Other circuits, however, have unanimously held that the failure to exercise good faith under the Act has a limited and restricted meaning; lack of good faith does not simply mean unfairness, it must be found in the context of actual or threatened coercion or intimidation.... Several circuits have also held that the coercion or intimidation

must include a wrongful demand which will result in sanctions if not met.... We agree with those circuits which hold that the coercion or intimidation must include a wrongful demand that would result in penalties or sanctions if not complied with. We also hold that the coercion or intimidation must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient.

*Id.* at 1056 (citations omitted); *see also Scuncio Motors, Inc. v. Subaru of New England, Inc.,* 555 F.Supp. 1121, 1133–34 (D.R.I.1982), *aff'd on other grounds,* 715 F.2d 10 (1st Cir.1983).

■ Applying this interpretation of section 1221(e) to the case at bar, we do not think that counts one and seven allege a failure to act in "good faith" within the meaning of the Dealer's Act. Count one alleges that, pursuant to the terms of the termination and repurchase agreements for Hull Dobbs and Hull Dobbs 65th, defendants were required to repurchase parts and accessories in accordance with the terms and conditions of paragraph 21(b) of the Puerto Rico Sales Agreements, and that they failed to do so. In an attempt to bring this alleged breach within the purview of the Dealer's Act, plaintiffs claim that the breach was "coercive" because defendants attempted to "pressure" Dobbs Houses to agree to the unreasonable, post-contractual "condition" that the parts and accessories in question be returned in clean, unmarked original factory cartons labeled with current Ford part numbers, and effectively "forced" plaintiffs to attempt to sell these goods on the open market.[5]

---

**5.** Paragraph 21(b) of the Puerto Rico Sales Agreements (reproduced in note 4, *supra* ) does not expressly state that parts and accessories must be returned in clean, unmarked original factory cartons labeled with current Ford part numbers. However, paragraph 21(b) does provide in subsections (i) and (ii) that each returned part and accessory must be in "first-class saleable condition" and be offered for sale by Ford on a current Ford price list or for use in a current Ford model vehicle. Furthermore, paragraph 21(b) provides in subsection (iv) that the "Dealer shall carefully pack and box, at the Dealer's expense, ... parts and accessories to be reacquired by the Company or returned by the Dealer ... as [Ford] may direct." Thus, based on the documents before us, we think there is legitimate room for disagreement as to whether the voluntary termination letters contained these conditions, although we need not express any view on the ultimate merits of the dispute between the parties.

While count one employs adjectives such as "coercive," "discriminatory," and "unreasonable" to describe defendants' refusal to repurchase certain parts and accessories, however, it utterly fails to suggest how this conduct constituted "a wrongful demand that would result in penalties or sanctions if not complied with." *Wallace Motor Sales,* 780 F.2d at 1056. Nowhere is it alleged that, by refusing to repurchase parts and accessories, defendants tried to coerce Dobbs Houses to do or refrain from doing anything.

At worst, defendants' conduct amounted to a breach of contract, which, without more, is not actionable under the Dealer's Act. *See, e.g., Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1039 (5th Cir. Unit A) (manufacturer's allegedly "deceitful and unkept promise to take back an overstock of parts," even if done "in 'bad faith' in the usual sense of the term," could not "be characterized as coercive, intimidating, or carrying threats"), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.,* 461 F.2d 608, 610 (7th Cir.) (the Dealer's Act "does not provide a new remedy for breach of contract but creates a new cause of action, an indispensable element of which is ... a lack of good faith in which coercion, intimidation, or threats thereof, are at least implicit"), *cert. denied,* 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972).

That plaintiffs may have felt "forced" to cover by attempting to sell parts and accessories on the open market does not alter this conclusion, because there is nothing in the complaint to suggest that defendants refused to repurchase the parts and accessories in order to compel such a sale. Cover is a practice ordinarily favored by basic principles of contract law. *See* E.A. Farnsworth, *Contracts* § 12.12, at 858 (1982) ("A court ordinarily will not compensate an injured party for loss that he could have avoided by making efforts appropriate, in the eyes of the court, to the circumstances.").

Count seven of the complaint is similarly deficient. Count seven alleges that, in the wake of the flooding damage caused by Hurricane David to the new Ford vehicle inventory at Hull Dobbs, defendants withdrew virtually all of the Ford warranties on the vehicles, and "unlawfully used their superior position and economic power to intimidate and coerce" Dobbs Houses into permitting defendants to affix metal plates and paper stickers to the vehicles indicating that the Ford warranties had been withdrawn. Count seven further alleges that defendants refused to pay Dobbs Houses approximately $170,000 in "model close-out rebates" and "luxury car incentives" owing to Hull Dobbs at the close of the 1979 model year.

Like count one, count seven fails to allege facts from which it could be concluded that any of these actions constituted coercion, threats, or intimidation within the meaning of the Dealer's Act. Even if defendants' withdrawal of the Ford warranties on the Hull Dobbs vehicle inventory and their refusal to pay Dobbs Houses certain rebates and incentives violated defendants' dealership agreements with Hull Dobbs, there is nothing in the complaint to suggest that these actions were designed to exert undue pressure on Dobbs Houses or compel Dobbs Houses to do anything. While Dobbs Houses may have felt that it was being coerced or intimidated when defendants placed metal plates and paper stickers on the Hull Dobbs vehicles publicizing the withdrawal of the Ford warranties, this was not the kind of *actual* intimidation or coercion contemplated by the Dealer's Act, *Wallace Motor Sales,* 780 F.2d at 1056, but merely a logical incident of defendants' withdrawal of the warranty protection after the flood. To accept plaintiffs' arguments to the contrary would render virtually any contract claim between an automobile dealer and an automobile manufacturer cognizable under the Act, a result which Congress plainly did not intend. *See* H.R.Rep. No. 2850, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad. News 4596, 4596 ("Unless the transactions between the parties involve coercion or in-

timidation, or threats of coercion or intimidation, the duty of good faith imposed by the bill does not prohibit recommendation, endorsement, exposition, persuasion, urging or argument normal in competitive commercial relationships.").

Hence, we agree with the district court that the complaint fails to state specific acts of coercive conduct that would support a claim under the Dealer's Act. In light of this conclusion, we need not address defendants' alternate contention that the termination and repurchase agreements which form the basis for count one were not "franchises" within the meaning of 15 U.S.C. § 1221(b) (1982).

### III.

Plaintiffs argue in the alternative [6] that, even if counts one and seven do not state claims under the Dealer's Act, the district court acted improperly in dismissing their commonwealth law claims against Ford Caribbean, because the district court should have exercised jurisdiction over these claims under the diversity statute, 28 U.S.C. § 1332 (1982), and dismissed the non-diverse defendant Ford pursuant to Fed.R.Civ.P. 21.[7] It is not clear from the district court's opinion whether the court considered this argument or not, because the court merely stated that it was dismissing plaintiffs' commonwealth law claims on the ground that there was not complete diversity of citizenship between the parties. In any event, we hold that the district court's dismissal was proper. Plaintiffs may not proceed solely against the diverse defendant Ford Caribbean, because Ford is an indispensable party to the suit. *See, e.g., Field v. Volkswagenwerk AG,* 626 F.2d 293, 296–97 (3d Cir.1980).

A district court's authority to dismiss a non-diverse party derives from Rule 21;

however, the factors which must be considered in determining whether a non-diverse party is indispensable are set forth in Fed.R.Civ.P. 19(b). *Field,* 626 F.2d at 297. Rule 19(b) provides in pertinent part,

> If a person ... cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

In *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 108–11, 88 S.Ct. 733, 737–39, 19 L.Ed.2d 936 (1968), the Supreme Court articulated the interests promoted by these four criteria as (1) the interest of the outsider whom it would have been desirable to join; (2) the defendant's interest in avoiding multiple litigation, inconsistent relief, or sole responsibility for a liability it shares with another; (3) the interest of the courts and the public in complete, consistent, and efficient settlement of controversies; and (4) the plaintiff's interest in having a forum.

■ Applying the criteria contained in Rule 19(b) to the case at bar, we have little difficulty concluding that the dismissal of

---

**6.** Although plaintiffs never specifically moved below to dismiss Ford, they did raise this argument in a supplemental brief filed in opposition to defendants' motion to dismiss. This was a sufficient presentation of the issue to the lower court for them to argue it on appeal.

**7.** Rule 21 provides,
*Misjoinder and Non-Joinder of Parties*

Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. Any claim against a party may be severed and proceeded with separately.

plaintiffs' action as to both Ford and Ford Caribbean was proper, the non-diverse defendant Ford being an indispensable party.[8] First, Ford has a substantial interest in the outcome of the dispute. Not only is Ford Caribbean a wholly-owned subsidiary of Ford, but it is clear from the face of the complaint that plaintiffs' commonwealth law claims are largely directed against the parent company. Ford is a signatory to the termination and repurchase agreements which form the basis for counts two and three, count four alleges that Ford wrongfully induced Ford Caribbean to breach its termination and repurchase agreement with Ford Caribbean, and counts five and six allege breaches of the dealership agreements between Ford and Hull Dobbs.

Thus, even if, as plaintiffs contend, Ford Caribbean bears joint and several liability with Ford for the conduct alleged in the complaint, it would be highly impractical to permit plaintiffs' action to proceed solely against Ford Caribbean. *See Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 559 (5th Cir.1985) (where plaintiffs sought to impose liability on parent corporation for acts of subsidiary, subsidiary was " 'more than a key witness whose testimony would be of inestimable value,' " but an " 'active participant' " whose joinder was required under Rule 19(b)); *Envirotech Corp. v. Bethlehem Steel Corp.,* 729 F.2d 70, 75–77 (2d Cir.1984) (parent corporation was indispensable party to counterclaim for breach of contract against subsidiary where three of seven contracts in issue did not involve the subsidiary and the remaining four had been assigned to the parent prior to the filing of the counterclaim).

Second, defendants have a substantial interest in avoiding multiple litigation, because it appears from the record that plaintiffs have an identical suit pending against Ford and Ford Caribbean in the Superior Court of Puerto Rico, San Juan Part.

Plaintiffs have not suggested any means of tailoring the federal action to avoid this prejudice to defendants, and to permit both the federal and commonwealth proceedings to go forward would necessarily "complicate and enlarge what would otherwise be a relatively straightforward contract action in a single court." *Acton Co. v. Bachman Foods, Inc.,* 668 F.2d 76, 81 (1st Cir.1982).

This brings us to the third factor, which the Supreme Court has identified with "the interest of the courts and the public in complete, consistent, and efficient settlement of controversies." *Provident Tradesmens Bank & Trust Co.,* 390 U.S. at 111, 88 S.Ct. at 739. We have no doubt that the commonwealth courts are capable of resolving the entire controversy between the parties and, as we observed in *Acton Co. v. Bachman Foods, Inc.,* 668 F.2d at 81, "[t]he public interest in avoiding piecemeal and inefficient litigation is especially strong where … it is evident that the ongoing state court action will adjudicate the entire controversy."

Fourth and finally, it follows from what we have said that plaintiffs have an adequate remedy in the commonwealth courts to vindicate their claims against both Ford and Ford Caribbean. Accordingly, the district court's dismissal of plaintiffs' action in its entirety was proper.

*Affirmed.*

---

8. We need not decide whether our review of the district court's action under Rule 19 should be governed by a legal error or an abuse of discretion standard, because under either standard we agree with the court's disposition. *Acton Co. v. Bachman Foods, Inc.,* 668 F.2d 76, 81 n. 2 (1st Cir.1982).