# United States Court of Appeals
## For the First Circuit

No. 03-2715

GEORGE LUSSIER ENTERPRISES, INC. D/B/A LUSSIER SUBARU;
SULLIVAN COUNTY MOTORS, INC. D/B/A SUBARU OF CLAREMONT;
CAMILLERI BROS., INC. D/B/A C&C SUBARU; BALD HILL REALTY, INC.
D/B/A BALD HILL SUBARU; KINNEY MOTORS, LTD.;
REYNOLDS GARAGE & MARINE,INC.,

Plaintiffs, Appellants,

v.

SUBARU OF NEW ENGLAND, INC.; ERNEST J. BOCH, JR. AND
JOSEPH APPELBE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Rosenn,[*] Senior Circuit Judge,
and Howard, Circuit Judge.

Richard B. McNamara, with whom Gregory A. Holmes, Stephanie A.
Bray, Elizabeth M. Leonard and Wiggin & Nourie, P.A. were on brief,
for appellants.
Donald R. Frederico, with whom Steven W. Kasten and McDermott,
Will & Emery were on brief, for Ernest J. Boch and Subaru of New
England, Inc.
Howard Cooper, with whom Nicholas Carter and Todd & Weld LLP
were on brief, for Subaru of New England, Inc.

[*] Of the Third Circuit, sitting by designation.

Ronald L. Snow, with whom Lisa S. Wade and Orr & Reno P.A. were on brief, for Joseph A. Appelbe.

Paul R. Norman, with whom Catherine L. Cetrangolo and Boardman, Suhr, Curry & Field LLP were on brief, for amicus curiae National Automobile Dealers Association.

December 16, 2004

**TORRUELLA**, **Circuit Judge**. Various New England Subaru dealers ("Dealers") appeal the summary judgment entered in favor of their distributor, Subaru of New England, Inc. ("SNE"), its sole shareholder and President, the late Ernest Boch, and its General Manager, Joseph Appelbe, in a class action commenced on March 5, 1999. Dealers assert that SNE controlled the vehicle allocation process to coerce them into purchasing unwanted accessories, and stated claims under the Federal Automobile Dealers' Day in Court Act ("ADDCA"), state dealer statutes, state contract law, the Sherman and Clayton Antitrust Acts, and the Racketeer Influenced Corrupt Organization Act ("RICO"). All claims were dismissed after discovery, and after careful review, we affirm.

## I. Background

SNE is the exclusive New England distributor of Subaru products. Since 1971, it has contracted with Subaru of America, Inc. ("SOA") to purchase a designated number of vehicles and to use its best efforts to promote and sell Subaru vehicles and accessories through sales representatives. SNE does not have the contractual right to sell vehicles to the public; rather, its distributorship agreement limits its activities to promoting the sale of Subaru products through the solicitation of and contracting with dealers.

SNE's contract with Subaru dealers incorporates SOA's "Standard Provisions." It requires the "Dealer to order and

-3-

purchase Cars, subject to availability, in adequate quantities and on a regular periodic basis in order for Dealer to achieve adequate sales performance." Although the agreement does not require SNE to sell all of the cars to its dealers, it requires SNE to "allocate all Subaru products equitably, using appropriate factors such as the respective inventory levels and sales performance of Distributor's dealers during a representative period of time immediately prior to such allocation."

## A.    **The Allocation System**

From February 1, 1987 until early 2001, SNE implemented the allocation provision under "Fair Share II."

Fair Share II established the number of regular allocation cars that each dealer was entitled to receive under fixed and variable components. The fixed component was based on the higher of a dealership's planned sales volume or its average actual sales three years prior to Fair Share II. The variable component was based on a dealer's rate of sales over time. Essentially, the more cars the dealers sold, the more cars they would earn in future allocations. Regular allocation vehicles comprised 88.5% of all vehicles sold to dealers during the class period.

Not every car that SNE buys from SOA, however, is distributed immediately to the dealers. SNE engages in the

industry practice[1] of retaining a certain percentage of cars for discretionary purposes. Fair Share II authorized SNE to withhold 10% of each vehicle shipment as "discretionary vehicles," which was later revised to 15% of Legacy models and 10% of all other models. Fair Share II further states that SNE will use these discretionary vehicles for demonstration, major auto shows, assistance to dealers, and VIPs. Discretionary vehicles comprised 11.5% of all vehicles sold to dealers during the class period.

Meanwhile, the regular allocation vehicles rejected by dealers are referred to as "turndown vehicles." Fair Share II did not specify how turndown vehicles should be reallocated; SNE sold them to other dealers in their districts. Any turndown vehicle that remained unsold at the end of the month became subject to the next monthly allocation.

Finally, initial allocation and "package models" vehicles comprised 1.5% of all cars distributed during the class period. Initial allocation vehicles are distributed in the first monthly

---

[1] The Massachusetts legislature, for example, recently endorsed this practice by amending its state dealer statute to allow manufacturers and distributors to withhold up to fifteen percent of cars and distribute them "for any business purpose that the manufacturer or distributor considers appropriate." Mass. Gen. Laws ch. 93B, § 4(c)(1)(i-ii)(2002). See also Coady Corp. v. Toyota Motor Distrib., Inc., 361 F.3d 50, 56 (1st Cir. 2004)(10% of cars and 15% of trucks retained from regular allocation); Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co., Inc., 773 F.2d 1193 (11th Cir. 1985)(15% of cars retained in discretionary pool); Colonial Dodge, Inc. v. Chrysler Corp., 11 F. Supp. 2d 737 (D. Md. 1996)(10% of cars retained in discretionary pool).

-5-

allocation of each new model year and are preaccessorized for dealers to display in the showroom.  Special package models are cars that SNE accessorized to create new models; they are sometimes built from the discretionary pool.

## B.  Conditioning and Concealment of Accessories

Dealers allege that during the class period -- from January 1995 to August 2001 -- SNE "hit upon a scheme to maximize its profits" by pre-installing accessories before vehicle distribution.  SNE installed more than $53 million worth of accessories during the class period, resulting in an average charge of $427 per vehicle.  To encourage such sales, SNE paid its district managers commissions on the sale of these accessories, which amounted to between 40% to 60% of the managers' total compensation.  SNE did not pay these commissions unless the district managers' average gross profit on such sales met a prescribed target of $140, requiring about $475 in accessory sales per vehicle.  SNE further encouraged the sale of overstocked accessories by providing district managers with "focus letters" identifying such accessories.

Dealers assert that SNE conditioned access to discretionary and turndown cars by coercing dealers to purchase accessories in regular allocation cars.  As evidence, dealers present an expert analysis establishing "a strong and statistically significant relationship between the volume of accessories

purchased by Dealers and the number of discretionary and turndown cars they subsequently purchased." Dealers also present anecdotal evidence from dealers and former SNE employees alleging that SNE (1) conditioned access to discretionary and turndown cars on a dealer's assent to purchase accessories for regular allocations cars, and (2) used techniques such as tampering with the computer-based allocations, altering the color and model mix of cars assigned to particular dealers, and refusing to fill "sold orders" from dealers who did not purchase enough accessories.

Dealers also assert that SNE fraudulently concealed its conditioning practice. As evidence, dealers offer letters sent by Appelbe and another SNE employee stating that "accessories are strictly optional! You do not have to purchase any accessories on any Subaru you purchase from SNE." Moreover, SNE told dealers at an advisory meeting on October 23, 1996 that "no vehicles will be pre-accessorized in the future with the exception of Safari and Rally [models]." An SNE representative also stated in a letter to a dealer that "you are always entitled to purchase vehicles with or without port installed accessories."

Dealers filed suit under the ADDCA, state dealer acts, RICO, the Sherman and Clayton antitrust acts, and state contract law, arguing that SNE coerced them into purchasing unwanted accessories and fraudulently concealed this practice. Both dealers and SNE submitted dueling summary judgment motions. On

-7-

September 26, 2003, the district court denied dealers' summary judgment motion and granted SNE's summary judgment motion on the ADDCA, state dealer statutes, antitrust acts, RICO, and state contract law claims.[2] Specifically, the court held, inter alia, that "SNE's conditioning practices do not violate the ADDCA or the state dealer acts and will not support a RICO extortion claim because they are not coercive; they do not violate the antitrust laws because SNE lacks market power in the relevant tying product market; and they do not breach SNE's dealer agreements because they are not unlawful, unethical, or inequitable." George Lussier, 286 F. Supp. 2d at 93. Dealers appeal the ADDCA, state dealer law, state contract law, and RICO[3] claims.

We now review each issue de novo, see, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 60 (1st Cir. 2004)(summary judgment motions reviewed de novo), "reviewing the entire record in the light most hospitable to the party opposing summary judgment" -- the Dealers. Euromotion, Inc.

---

[2] The court, however, denied without prejudice SNE's summary judgment motion on dealer's claim that SNE used other coercive means to induce dealers to purchase accessories. The court reasoned that these claims are subsidiary to the conditioning claim, and "may not warrant class action treatment because common questions do not predominate and a class action would not be superior to other forms of adjudication." George Lussier Enters., Inc. v. Subaru of New England, Inc., 286 F. Supp. 2d 86, 93 (D.N.H. 2003).

[3] The RICO claim includes coercion, mail and wire fraud, and substitution of defendants.

-8-

v. <u>BMW of North America, Inc.</u>, 136 F.3d 866, 869 (1st Cir. 1998)(citations omitted).

## II. <u>Analysis</u>

### A. <u>The ADDCA</u>

The ADDCA provides automobile dealers with a federal cause of action against automobile manufacturers who fail "to act in <u>good faith</u> in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer . . . ." 15 U.S.C. § 1222 (1998)(emphasis added). The Act defines "good faith" as

> the duty . . . to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: <u>Provided</u>, That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith.

15 U.S.C. § 1221(e).

In interpreting ADDCA's good faith provision, "[t]his court has read the requirements of the ADDCA very narrowly to require 'actual or threatened <u>coercion</u> or intimidation.'" <u>General GMC, Inc.</u> v. <u>Volvo White Truck Corp., et al.</u>, 918 F.2d 306, 308 (1st Cir. 1990)(quoting <u>H.D. Corp. of Puerto Rico</u> v. <u>Ford Motor Co.</u>, 791 F.2d 987, 990 (1st Cir. 1986))(emphasis added). Lack of "good faith" does not simply mean malicious conduct or unfairness; "it must be found in the context of actual or threatened coercion or intimidation." <u>H.D. Corp.</u>, 791 F.2d at 990. Coercion "must be

-9-

actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient." Id. For example, a manufacturer "condition[ing] continuation of a franchise upon certain conduct, even if characterizable as a threat, cannot constitute forbidden coercion per se. It must appear that the condition was unfair or inequitable." Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 442 (1st Cir. 1966).

This Court has held, and we again emphasize, that "coercion or intimidation [under the ADDCA] must include a wrongful demand that would result in penalties or sanctions if not complied with." Wallace Motor Sales, Inc. v. Am. Motors Sales Corp., 780 F.2d 1049, 1059 (1st Cir. 1985)(agreeing with several other circuits that "coercion or intimidation must include a wrongful demand which will result in sanctions if met."). That is, to state a cause of action under the ADDCA, the aggrieved dealer must produce evidence that the manufacturer or distributor[4] (1) made a wrongful demand, coupled with (2) sanctions, or threat thereof. Id. at 1056. Otherwise, summary judgment is warranted if the dealer "has produced no evidence showing that it was subjected to coercion or intimidation" by the manufacturer or distributor. General GMC, 918 F.2d at 308.

---

[4] "It is entirely consistent with both the purpose and language of the act to hold that 'automobile manufacturer' means, inter alia, 'automobile distributor,' when the distributor is subject to the manufacturer's control." Rohlsen, 360 F.2d at 441.

-10-

In the instant case, appellants argue that SNE's pre-accessorization practice amounts to coercion and thus violates ADDCA's good-faith requirement because it solely benefits SNE at the expense of dealers. Appellants present three key pieces of evidence to show coercion: (1) expert testimony establishing a "strong and statistically significant relationship between the volume of accessories purchased by Dealers and the number of discretionary and turndown cars they subsequently purchased"; (2) anecdotal evidence from dealers and former SNE employees alleging that SNE conditioned access to turndown and discretionary cars based on dealers' assent to purchase accessories for regular allocation cars; and (3) data indicating the disparity in price of average accessories between turndown, discretionary, and initial and special model vehicles ($490, $742, $1,360, respectively) versus regular allocation vehicles ($338). This proffered evidence ostensibly demonstrates that SNE "coerced" appellant dealers to buy accessories in regular allocation cars to gain access to discretionary and turndown cars, and that SNE installed leftover and "unwanted" accessories in turndown and discretionary cars. SNE's "coercive" practice, appellants argue, confers sole benefit to SNE to the sole detriment of the dealers, who allegedly are unable to pass the cost increases to consumers and must wait longer to sell these highly accessorized cars.

Viewing the evidence in the light most favorable to appellants, we find that SNE's conduct does not amount to coercion within the meaning of ADDCA. We simply fail to see how SNE's practice of conditioning access to, or accessorizing, discretionary and turndown cars -- cars which dealers concede they had no contractual right to receive -- constitutes coercion.

Several courts have found no coercion for various conditions imposed by distributors for dealers' access to vehicles which they were not entitled to receive. In Cabriolet Porsche Audi, Inc. v. Am. Honda Motor Co., Inc., 773 F.2d 1193, 1209-11 (11th Cir. 1985), for example, the Eleventh Circuit held that a distributor's offer of extra cars beyond the regular allocation process, in return for establishing an exclusive facility, does not amount to coercion in violation of ADDCA. 773 F.2d at 1209-11. The court stated that "[w]e have little doubt that had [the distributor] threatened to deny [the dealer] all cars, or any cars to which it was entitled, unless [the dealer] provided an exclusive facility, this would be evidence of coercion." Id. at 1210 (emphasis added). The distributor did not make a wrongful demand because it "did not threaten to take away, and did not take away, cars to which [the dealer] was entitled under the allocation system." Id. A manufacturer's or distributor's suggestions of ways to obtain extra cars -- more cars than a dealer is entitled to

receive under the regular allocation system -- does not amount to coercion in violation of ADDCA.  Id.

Similarly, in Colonial Dodge, Inc. v. Chrysler Corp., 11 F. Supp. 2d 737, 744-46 (D. Md. 1996), aff'd, 121 F.3d 697 (4th Cir. 1997), a district court granted summary judgment for the manufacturer because its requirement that dealers accept hard-to-sell automobiles as a precondition to receiving excess, fast-selling automobiles did not amount to coercion under the ADDCA.  As evidence, the dealers offered affidavits indicating that the manufacturer refused to supply high-end vehicles beyond what was allocated under the "turn and earn" method unless the dealers agreed to order additional low-demand models.  Id. at 746.  The court held that since dealers offered no evidence that the manufacturer was required under any existing agreement to provide these extra vehicles, or that the manufacturer threatened to cut back on their supply of other vehicles if dealers did not order additional vehicles beyond the "turn and earn" system, dealers "cannot demonstrate coercion within the meaning of the statute." Id.  Thus, the court granted summary judgment for the manufacturer because dealers failed to establish any genuine dispute of material fact under the ADDCA.  Id.

We find these cases persuasive, and thus hold that a manufacturer's conditioning of access to vehicles beyond the regular allocation process, without more, does not amount to a

"wrongful demand" that would constitute coercion under ADDCA's good-faith requirement. Since dealers are not contractually entitled to these extra vehicles, a manufacturer's decision to impose reasonable conditions for dealer access is neither "wrongful" nor even a "demand." These conditions are not wrongful because they are part of a bargained-for exchange (e.g., accessories for extra cars, taking less-desirable cars to access discretionary highly desirable cars); neither do these conditions constitute a "demand" because dealers need not take these extra cars. Rather, these conditions constitute reasonable business judgments in a free market economy, and "[a] distributor acting honestly is entitled to latitude in making commercial judgments." Coady Corp. v. Toyota Motor Distrib., Inc., 361 F.3d 50, 56 (1st Cir. 2004). Summary judgment is therefore proper if a plaintiff dealer fails to offer evidence showing a wrongful demand and sanctions, and thus coercion, under the ADDCA's good-faith requirement.

Here, since dealers concede that they had no contractual right to receive either turndown or discretionary vehicles,[5] this ends our inquiry. Dealers' proffered evidence, even if taken to be true, merely establishes that (1) SNE conditioned access to turndown and discretionary cars based on dealers' assent to

---

[5] In response to SNE's Motion to Dismiss, dealers state that they "do not allege or in any way presume that they are contractually entitled to a certain percentage of discretionary cars."

purchase accessories for regular allocation cars, and (2) SNE installed unwanted leftover accessories on the turndown and discretionary cars. However, since dealers offer no evidence indicating that SNE made wrongful demands to access vehicles that dealers were contractually entitled to receive, the district court properly granted summary judgment for SNE.

Appellants nonetheless urge us to follow language from our decision in Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 442 (1st Cir. 1966) to define "good faith" under ADDCA. In Rohlsen, we held that the distributor's termination of a dealer's franchise related to the conduct of a dealer's agency, or the dealer's rejection of the distributor as partner on unreasonable terms, was a jury question. Id. at 444. Rohlsen states, in relevant part, that "we think there is an important difference between two kinds of improper conditions that a manufacturer might impose and back up by threats." Id. at 442. "Particularly suspect under the act are conditions which benefit only, or primarily, the manufacturer . . . as distinguished from requirements that would tend to work to the mutual advantage of both parties." Id. Appellants allege that under this test, SNE's pre-accessorization practice only benefits SNE, and thus violates SNE's good-faith requirement.

We reject appellants' reading on two grounds. First, appellants' proffered "test" is mere dicta; we merely explored two

-15-

possible scenarios for a condition to constitute coercion under ADDCA's good-faith requirement. We never announced a test for coercion, and thus good faith, in Rohlsen. See Wallace, 780 F.2d at 1056 ("This is the first time the meaning of this provision ['good faith' in 15 U.S.C. § 1221(e)] has come up for review in this circuit."). Rather, we have now clarified that good faith under ADDCA requires a showing of (1) wrongful conduct coupled with (2) sanctions, or threat thereof. See also id. at 1059. And as we have explained, appellants fail to state a claim under this test. Second, even under the alleged "Rohlsen test," appellants fail to show that SNE's pre-accessorization practice lacks mutual benefit. Appellant dealers gained the additional benefit of cars that they were not otherwise entitled to receive and the additional profits that could be gained therefrom.

Finally, although we agree with appellants and amicus that the district court erred in instituting a "'brand new' viability test," summary judgment is nonetheless warranted under the coercion test. Contrary to the district court's analysis, plaintiff dealers need not offer evidence that the contested "practices threatened any dealer's ability to conduct successful business operations" to state a claim under ADDCA. Such requirement is too narrow. It is enough that dealers offer evidence that the manufacturer or distributor made a wrongful demand coupled with threats of sanctions, such as withholding

-16-

vehicles that dealers are legally entitled to receive. The district court's error, however, does not change the propriety of summary judgment in the instant case. See, e.g., Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 17 (1st Cir. 2000)(citations omitted) ("We may . . . uphold the district court's order granting summary judgment regardless of whether we reject or adopt its rationale, so long as an 'independently sufficient ground' is made manifest by the record.").

Thus, we affirm the district court's judgment on the ADDCA claim.

## B.  **State Dealer Acts**

In addition to the ADDCA claim, appellants allege that the state statutory counterparts to the ADDCA prohibit SNE's conduct. Appellants argue that contrary to the district court's holding, these state dealer statutes define coercion more broadly than the ADDCA and, consequently, cover the type of conduct engaged in by SNE. We disagree.

Each of the six states where SNE operates have enacted statutory counterparts to the ADCCA. Massachusetts[6] makes it

---

[6]  The Massachusetts state dealer act makes it unlawful for a manufacturer or distributor to "coerce" a dealer to "accept or buy any . . . accessory . . . which has not been ordered or requested by the motor vehicle dealer." Mass. Gen. Laws Ann. ch. 93B, § 4(2)(b) (1997 & Supp. 2003).

unlawful to "coerce," Rhode Island,[7] Maine,[8] and New Hampshire[9] make it unlawful to "coerce or attempt to coerce," Vermont[10] makes it unlawful to "require or coerce," and Connecticut[11] makes it unlawful to "require," dealers to buy, order, or accept accessories that they have not voluntarily ordered.  Of these, only the New Hampshire statute defines "coercion," which adopts language analogous to the ADDCA.[12]

---

[7]   The Rhode Island state dealer act makes it unlawful for a manufacturer to "coerce, or attempt to coerce," a dealer "to order or accept . . . accessories . . . which the motor vehicle dealer has not voluntarily ordered." R.I. Gen. Laws § 31-5.1-4(b) (2002).

[8]   The Maine state dealer statute makes it unlawful for a manufacturer or distributor to "coerce or attempt to coerce" a dealer to "order or accept delivery of . . . accessories . . . which such motor vehicle dealer has not voluntarily ordered."  Me. Rev. Stat. Ann. tit. 10, § 1174(2) (1997 & Supp. 2002).

[9]  The New Hampshire state dealer statute makes it unlawful for a manufacturer "to coerce or attempt to coerce"  a dealer to "[o]rder or accept delivery of . . . accessories . . . which such motor vehicle dealer has not voluntarily ordered."  N.H. Rev. Stat. Ann. § 357-C:3 (1995 & Supp. 2002).

[10]   The Vermont state dealer statute makes it unlawful for a manufacturer to "require or to coerce" a dealer to "order or accept delivery of any . . . accessory . . . which shall not have been voluntarily ordered" by the dealer.  Vt. Stat. Ann. tit. 9, § 4096 (2002).

[11]   The Connecticut state dealer statute makes it unlawful for a manufacturer or distributor to "require" a dealer to "[o]rder or accept delivery of any . . . accessory . . . not . . . voluntarily ordered by the dealer."  Conn. Gen. Stat. Ann. § 42-133bb (2003).

[12]   New Hampshire defines "coerc[ion]" as the "the failure to act in a fair and equitable manner in performing or complying with any terms or provisions of a franchise or agreement; provided, however, that recommendation, persuasion, urging or argument shall not be synonymous with 'coerce' or lack of 'good faith'."  N.H. Rev. Stat.

Appellants argue that the state dealer statutes' prohibitions against coercing dealers into purchasing unordered accessories extend beyond "coercion" as understood under the ADDCA. Appellants cite a First Circuit decision where we stated that in construing the Massachusetts dealer act, "[b]ad faith may encompass broader conduct under Chapter 93B than mere coercion or intimidation." General GMC, 918 F.2d at 309 (citing Tober Motors, Inc. v. Reiter Oldsmobile, Inc., 376 Mass. 313, 319-20, 381 N.E.2d 908 (1978)). This precedent, along with the statutes' legislative history, ostensibly demonstrate a legislative intent to eliminate the dealer's burden of showing wrongful conduct and threat of sanctions to state a claim under the state dealer acts.

Although more compelling than the ADDCA claim, we find appellants' argument unpersuasive. First, appellants' reliance on General GMC is misplaced. In General GMC, we held that although summary judgment was proper as to the ADDCA claim because the dealer produced no evidence of coercion, summary judgment was improper as to the state dealer claim because genuine issues of material fact existed as to whether the manufacturer acted in bad faith in terminating the dealer's franchise. 918 F.2d at 308-09. We reasoned that because Chapter 93B -- the Massachusetts counterpart to the ADDCA -- does not define "bad faith" or "good cause," a court is not bound by the same restrictions that exist

Ann. § 357-C:3 (1995 & Supp. 2002).

-19-

under ADDCA: "[b]ad faith may encompass broader conduct than mere coercion or intimidation." Id. at 308. Our holding, however, interpreted Section 4(1) of 93B, which prohibits manufacturers from acting in "bad faith," and Section 4(3)(e), which prohibits manufacturers from cancelling or terminating a franchise "without good cause." The issue here pertains to a different section -- Section 4(2) -- which prohibits "coercion," specifically, the manufacturer's coercion of dealers into purchasing accessories. Therefore, we do not read General GMC to mean that "coercion" under the state dealer statutes automatically encompasses conduct beyond its meaning under ADDCA.

To the contrary, courts have consistently held that "coercion" under state dealer statutes holds the same meaning as under the ADDCA. See, e.g., Hubbard Chevrolet Co. v. Gen. Motors Corp., 873 F.2d 873, 876 (5th Cir. 1989)(declining to read a broader definition of "coercion" under Mississippi dealer's act because there is "no evidence indicating that the Mississippi statute's further definition of 'coerce' represents an effort to broaden the scope of 'good faith.'"); Gage v. Gen. Motors Corp., 796 F.2d 345, 350-51 (10th Cir. 1986)(assuming that federal case law interpreting "coercion" under the ADDCA also governed the similar language in the Colorado statute); Subaru Distrib. Corp. v. Subaru of Am., 47 F. Supp. 2d 451, 465, n.9 (S.D.N.Y. 1999)(noting that "coercion" has been interpreted to have the same meaning under

both the New York Dealer Act and the ADDCA); Colonial Dodge, 11 F. Supp. 2d at 744 (holding that "[w]hile there are slight differences between the state and federal statutes, 'coercion' under both the State Act and the ADDCA embodies the same concept, and accordingly the same analysis applies.").

We find these cases instructive, and agree with the district court that "coercion" holds the same meaning under both the state dealer acts and the ADDCA.[13] The Rhode Island Supreme Court has already defined its own state dealer statute as such: "we define coercion as 'a wrongful demand which will result in sanctions if not complied with.'" Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co., 466 A.2d 1153, 1160 (R.I. 1983)(quoting Marquis v. Chrysler Corp., 577 F.2d 624, 633 (9th Cir. 1978) (quoting Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.2d 683, 685 (6th Cir. 1976)). As for Massachusetts, Maine, and Vermont,[14] the fact that their state legislatures have not defined "coercion" suggest that they did not intend to give the word a different meaning than it has in the ADDCA. While we are not bound by the same restrictions under ADDCA because the state legislatures

---

[13] Moreover, the argument that "coercion" holds different meanings under different state dealer statutes negates the presence of "common questions of law" necessary for class certification. See Fed. R. Civ. P. 25(a).

[14] Vermont makes it unlawful to "require or to coerce" dealers into purchasing unordered accessories. Vt. Stat. Ann. tit. 9, § 4096. For analysis of the "require" component, see next paragraph.

-21-

did not define "coercion," cf. General GMC, 918 F.2d at 309 (reasoning that because the state counterpart to the ADDCA does not define "bad faith" or "good cause," a court is not bound by the same restrictions as under the ADDCA in determining "bad faith"), we see no reason to depart from its federal meaning in this case. As for New Hampshire, the fact that its definition of "coercion" mirrors the ADDCA language suggests that it holds the same meaning of wrongful conduct and threat of sanctions as the ADDCA.

Finally, the fact that Connecticut does not mention "coercion," but merely makes it unlawful to "require" dealers to purchase unordered accessories, does not warrant reversal on the state dealer statute issue. We simply fail to see how SNE is "requiring" dealers to purchase accessories in the discretionary and turndown cars when dealers need not purchase these cars in the first place; individual dealers have no contractual obligation to receive or purchase any cars beyond the regular allocation process. Since dealers are not "required" to purchase these accessories, no genuine issue of material fact exists under the Connecticut statute.

For the foregoing reasons, we affirm the district court's summary judgment on the state dealer statute claims.

## C.  **State Contract Claims**

Appellants also allege that SNE breached its contractual obligation to allocate cars "fairly and equitably" by concealing

-22-

the true terms for allocating discretionary and turndown cars: the purchase of accessories. We are not convinced.

SNE's franchise agreement with each dealer obligates SNE to "perform[ ] its obligations under the Agreement in a lawful and ethical manner," including "allocat[ing] all affected Subaru products equitably, using appropriate factors." Fair Share II similarly expressed SNE's desire to allocate vehicles "in a manner that, in SNE's opinion, will maximize the business opportunity for both SNE and its dealers consistent with SNE's desire to allocate vehicles fairly and equitably." (emphasis added). Fair Share II is silent on turndown vehicles, but describes discretionary cars as "[v]ehicles to be used as demonstrators by [SNE]; vehicles used for major auto shows; vehicles set aside to assist dealers who, at the sole discretion of [SNE], need assistance and vehicles delivered to VIPs." (emphasis in original). Fair Share II also refers to discretionary cars as potentially used for "market action," an undefined term.

Appellants argue that SNE breached these contractual obligations and deceived dealers (1) by not stating that it intended to sell discretionary cars only with accessories, (2) by not stating anything about turndown cars, and (3) by using discretionary cars to encourage the purchase of accessories in regular allocation cars. Viewing the evidence in the light most favorable to appellants, and reviewing the district court's holding

-23-

de novo,[15] we nonetheless find that SNE did not breach its contract with the dealers.

First, we reject appellants' argument that SNE breached its contractual obligation to distribute all Subaru products "fairly and equitably" by failing to state its intent to sell discretionary cars only with accessories. "Every system has pluses and minuses, and a fair allocation system does not mean one without wrinkles." Coady, 361 F.3d at 58. For example, we recently noted that a distributor's failure to have a "written policy" on a particular method of allocation is "not itself arbitrary or unfair," especially when the "allocation system depends, to some extent, upon each district manager's discretion in offering vehicles to dealers." Id. at 58. We have also upheld a district court finding that a manufacturer did not breach its contract to distribute cars "fair[ly] and equitab[ly]" during a time of increased shortage, as long as the dealer received all that it was entitled to receive under the contract. Narragansett Motors, Inc. v. Packard Motor Car Co., 193 F.2d 545, 546 (1st Cir. 1951).

---

[15] "Contract interpretation is often said to be 'a question of law' for the trial judge and, accordingly, subject to de novo review by the appellate court." Principal Mut. Life Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 3 (1st Cir. 2000) (citing Commercial Union Ins. Co. v. Gilbane Bldg. Co., 992 F.2d 386, 388 (1st Cir. 1993)). For "disputes of fact relating to the construction of contract terms," however, "those findings are subject to deference on review." Id. (citing United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 687 (1st Cir. 1995)).

Here, although we would have preferred that SNE explicitly stated its conditioning practice in the contracts, we nonetheless conclude that SNE did not breach its contractual obligation to distribute all Subaru products "fairly and equitably." SNE's failure to state its conditioning practice in the contracts, standing alone, is insufficient to find a breach of its contractual duty of fair and equitable allocation. See Coady, 361 F.3d at 58. Discretionary vehicles, by their very nature in the contracts,[16] are distributed at the "discretion" of SNE, subject only to a "fair and equitable" allocation. The fact that dealers have received all that they were entitled to receive under the contract -- through regular allocation vehicles comprising 88% of all cars distributed during the class period -- supports a finding of "fair and equitable" allocation. See Narragansett Motors, 193 F.2d at 546. Moreover, the fact that all dealers had to purchase accessorized discretionary cars if they wanted access to such cars supports a finding of "equitable" allocation. Thus, along with the fact that neither the Dealership Agreements nor Fair Share II forbids SNE's accessorization of discretionary cars, we find that SNE did not breach its contract to "fairly and equitably" distribute discretionary cars.

---

[16] Fair Share II specifies that discretionary vehicles will be set aside, inter alia, "to assist dealers who, at the sole discretion of Subaru of New England, need assistance." (Emphasis added).

-25-

Under the same analysis, we likewise reject appellant's argument regarding turndown cars. SNE's failure to have a written policy on turndown cars, without more, does not render its allocation system unfair or inequitable. See Coady, 361 F.3d at 58. Since dealers received all that they were entitled to receive under the regular allocation process, and since turndown cars have already passed through this agreed-upon regular allocation process, we do not find that SNE breached its contract. See Narragansett Motors, 193 F.2d at 546.

Finally, we reject appellants' argument that SNE breached it contracts by using discretionary cars to encourage the purchase of accessories in regular allocation cars. We defer to the district court's factual finding that "more than 88% of all vehicles were initially allocated under Fair Share II using a formula that did not take into account whether a dealer had agreed to purchase accessories." George Lussier, 286 F. Supp. 2d at 101.

Therefore, since appellants "provide[s] no reason to suppose that allocation system claims that have failed under the statute should prevail under the contract, . . . no more need be said about this contract-claim perspective." Coady, 361 F.3d at 59. We uphold the district court's grant of summary judgment on these claims.

## D. RICO Claims

Appellants further allege claims under RICO,[17] arguing that "[t]he same conduct that constituted a wrongful demand and threatened sanction, and which violated these pre-existing rights guaranteed by State [dealer] and Federal [ADDCA] statutes, is extortion under the Hobbs Act." This argument also fails.

The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or <u>fear</u>, or under color of official right." 18 U.S.C. § 1951 (2000)(emphasis added). Although "fear" may include economic fear, <u>see</u> <u>United States</u> v. <u>Hathaway</u>, 534 F.2d 386, 395-96 (1st Cir. 1976), "there is nothing inherently wrongful about the use of economic fear to obtain property," <u>United States</u> v. <u>Sturm</u>, 870 F.2d 769, 773 (1st Cir. 1989). Indeed, "the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions." <u>Brokerage Concepts, Inc.</u> v. <u>U.S. Healthcare, Inc.</u>, 140 F.3d 494, 523 (1st Cir. 1998). Rather, economic fear is wrongful under the Hobbs Act if the plaintiff had a pre-existing statutory right to be free from the defendant's demand. <u>See</u> <u>id.</u> at 525-26 (holding that plaintiff failed to state

---

[17] RICO, 18 U.S.C. §§ 1961-1968 (2000), primarily designed as a criminal statute, <u>see</u> <u>Sedima, S.P.R.L.</u> v. <u>Imrex Co.</u>, 473 U.S. 479, 498 (1985), also provides civil remedies -- including treble damages and attorney's fees -- to persons injured in their business or property by a prohibited act. 18 U.S.C § 1964(c).

an extortionate predicate act because plaintiff had no pre-existing right to be an approved provider, and thus free of economic fear); <u>Viacom Int'l Inc.</u> v. <u>Icahn</u>, 747 F. Supp. 205, 213 (S.D.N.Y. 1990), <u>aff'd on other grounds</u>, 946 F.2d 998 (2d Cir. 1991)(distinguishing between "hard bargaining" and extortion based on the plaintiff's "pre-existing entitlement to pursue his business interests free of the [economic] fear he is quelling").

Here, appellants argue that since SNE's conditioning practice constitutes coercion under the state dealer statutes and the ADDCA, the practice also constitutes extortion under the Hobbs Act. We have now clarified, however, that such practice does not violate the ADDCA or state dealer statutes because conditioning access to cars beyond the dealer's rightful entitlement does not amount to a "wrongful demand" to constitute a component for coercion. Thus, assuming <u>arguendo</u> that we have adopted appellants' rationale, since SNE's conditioning practice is not coercive under the ADDCA, neither is it extortionate under the Hobbs Act. SNE's conditioning of access to cars to which dealers had no pre-existing

entitlement[18] represents lawful hard-bargaining, not unlawful extortion.

Appellants further allege that SNE engaged in mail and wire fraud under RICO.  Specifically, SNE allegedly (1) withheld computer-allocated cars from a dealer's folder and then told the dealers that they were hand-allocated cars which could only be obtained with accessories, (2) shuffled load sheets from one dealer folder to another to ensure that dealers who bought more accessories received more desirable cars, and (3) repeated false assurances such as "accessories are strictly optional" whenever the dealers became restless or threatened a lawsuit.  Dealers argue that since these false statements were made through mails and wires and were sufficiently numerous to comprise a RICO "pattern," they have stated a civil RICO claim.  Since dealers fail to establish causation, however, this claim also fails.

To have standing in a civil RICO claim, plaintiffs must show "some direct relation between the injury asserted and the injurious conduct alleged." Holmes v. Securities Investor Prot. Corp., 503 U.S. 258, 268 (1992).  Plaintiffs may not succeed by

---

[18] We also reject dealers' argument, raised for the first time in this appeal, that they had a "collective" right to receive all of the vehicles delivered by SOA to SNE for distribution through that system.  Not only is this issue waived since dealers did not make this argument in the district court, see Sammartano v. Palmas del Mar Prop., Inc., 161 F.3d 96, 97 (1st Cir. 1998), but each dealer had a separate contract with SNE and thus had no "collective" entitlement.

merely proving that the predicate acts were a "cause in fact" of the plaintiffs' injuries; rather, Section 1964(c) requires that the defendant's specified acts of racketeering were the proximate cause of the plaintiffs' injuries. Id. at 268; Camelio v. Am. Fed'n, 137 F.3d 666, 669-70 (1st Cir. 1998)(dismissing plaintiff's RICO claim and explaining proximate causation requirements under 18 U.S.C. § 1964(c)). Otherwise, plaintiffs may not recover in a civil RICO claim if their injuries are so far removed from the defendant's acts that they are indirect and derivative. Holmes, 503 U.S. at 268-69 (holding that plaintiff did not have standing because his injuries were indirect as his losses were purely contingent on the insolvency of third parties).

Here, dealers fail to establish a "direct relation between the injury asserted and the injurious conduct alleged." See id., 503 U.S. at 268. The "injurious conduct alleged" involves the fraudulent concealment of SNE's option-packing scheme. The "injury asserted" involves costs associated with the (1) purchase of unwanted accessories, (2) payment of floor plan interest for accessorized vehicles that took longer to sell, and (3) reductions in the value of their dealerships. The injury asserted, however, was directly caused by the option-packing scheme, rather than the fraudulent scheme of concealment. Dealers fail to offer any evidence that the alleged fraud directly caused specific injuries, such as a dealer signing a dealer contract or

making substantial investment in a dealership as a result of the fraud. Although SNE's alleged fraudulent conduct may have contributed to dealers' specific injuries -- i.e., buying unwanted accessories, paying floor plan interests, reducing the value of their dealerships -- such indirect and derivative injuries are insufficient to have standing in a civil RICO claim. See Holmes, 503 U.S. at 268-69.

For the foregoing reasons, appellants' civil RICO claims fail as well.[19] Finally, since the only claim against the late Ernest Boch individually is the failed civil RICO claim, we need not decide appellants' last issue of whether the district court erred in denying their motion to substitute defendants.

---

[19] Since appellants lack standing to state a civil RICO claim, this ends our inquiry. Nevertheless, we note that appellants' civil RICO claim would also fail as a matter of law because they could not establish that SNE used an "enterprise" as a vehicle for racketeering, thus corrupting an otherwise lawful enterprise. See Nat'l Org. for Women v. Scheidler, 510 U.S. 249, 259 (1994); United States v. Turkette, 452 U.S. 576, 583 (1981). Appellants allege that the New England Subaru Dealer Network, which presents dealer concerns to SNE through its Advisory Board, constitutes a RICO "enterprise." Far from a prototypical RICO enterprise, however, there is no evidence that SNE "was able to commit the predicate [racketeering] acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of its association with the enterprise" -- the Dealer Network. United States v. Marino, 277 F.3d 11, 27 (1st Cir. 2002). See also Fitzgerald v. Chrysler Corp., 116 F.3d 225, 227-28 (7th Cir. 1997)(describing a prototypical RICO case as one where the "defendant gains additional power to do evil by taking over a seemingly legitimate enterprise"). Since SNE did not gain additional power to "racketeer" and engage in mail and wire fraud by "taking over" the Dealer Network, appellants' RICO claim fail as a matter of law.

In closing, we note that SNE "ought to reflect that it has enjoyed a measure of good fortune in escaping unscathed in this lawsuit." Cf. Coady, 361 F.3d at 62. Its allocation and concealment practices were no model of perfection; individual dealers could plausibly pursue claims that SNE used other coercive means to induce dealers to purchase accessories. See George Lussier, 286 F. Supp. 2d at 93. Nonetheless, with regard to the class action claims and issues on this appeal, the judgment is

**<u>Affirmed</u>**.