**Jose SANCHEZ, et al., Plaintiffs,**

v.

**TRIPLE–S MANAGEMENT CORPORATION, et al., Defendants.**

**Civil No. 03–1967 (JAF).**

United States District Court, D. Puerto Rico.

May 5, 2006.

## OPINION AND ORDER

FUSTE, Chief Judge.

Plaintiffs, José Sánchez, Nilsa Irizarry, and their conjugal partnership, d/b/a "Laboratorio Clínico Irizarry Guash"; Delma Rodríguez, Wilmer Roldán, and their conjugal partnership, d/b/a "Laboratorio Salimar"; Maite Rolón Balseiro, César del Valle Vague, and their conjugal partnership, d/b/a "Laboratorio Clínico Rolón"; Oim Enterprises, Inc., d/b/a "Laboratorio Clínico Ramos"; Héctor Meléndez Mojica, Elba Rivera Martínez, and their conjugal partnership; José Zayas, Ana Hernández Rivera, and their conjugal partnership; Miguel Garratón, Frances Gutiérrez Martínez, and their conjugal partnership; Néstor Allende Ortiz, Rosa Asparo Plana, and their conjugal partnership; Medical Geriatrics and Administrative Services, Inc.; Outpatient Administrative Services, Inc.; José E. Varela Rosario, Migdalia Quiles Rodríguez, and their conjugal partnership, d/b/a "Farmacia San José" and d/b/a "Farmacia de Aquí"; José A. Torres, Ana Delia Marrero, and their conjugal

partnership, d/b/a "Farmacia San Antonio"; Alicia Feliberti–Irizarry; Guillermo J. Fernández; Rodolfo Ruiz Brignoni; Lydia Ayala Díaz; José William Vázquez; Pablo Rivera Mercado; Isolina Ruiz and José Vega, and their conjugal partnership; Frances Matos Ortiz; Jorealis González and Aymette Vigo González; Lendis, Karla Alemañy and Alejandra Ojeda Alemañy; Danieric Miranda and Darryl Aquino Miranda, and their conjugal partnership; Frances Matos Ortiz; Lydia Ayala Díaz; Edgardo Rodríguez Marrero; Roy Brown; Dr. Sammy Garau Díaz; Ketty Díaz García; Aedna Martínez Lazú; Andrés Romero Dest; and Ana I. Rodríguez Marrero bring the present class action against Defendants, Triple–S Management Corporation, Triple–S, Inc.; Seguros Triple–S, Inc.; Interactive Systems, Inc.; Triple–C, Inc.; Accessso–Salud, Inc.; MC–21 Corporation; Ramón M. Ruiz Comas, Miguel Vázquez–Deynes; Dr. Críspulo Rivera Ofray; Dr. Belisario Matta; Dr. Fernando L. Longo; Dr. Wilmer Rodríguez Silva; Dr. Fernando Ysern–Borrás; Dr. Emigdio Buonomo; Dr. Angel Hernández Colón; and the conjugal partnerships composed by each individual defendant and their respective spouses, asserting claims under the Racketeer Influenced and Corrupt Organization Act ("RICO"), as amended, 18 U.S.C. § 1962 (2000 & Supp.2004). Plaintiffs invoke this court's federal question jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964 (2001 & Supp.2004). Plaintiffs seek monetary and equitable remedies under RICO based on their allegations of Defendant's fraudulent activities. *Docket Document Nos. 117* (amended complaint).

## I.

### *Procedural Synopsis*

Plaintiffs allege that an enterprise composed by an association of Defendants and other named and unnamed parties, engaged in a fraudulent scheme to wrongfully overcharge and underpay Plaintiff Providers and Subscribers through a pattern of mail and wire fraud and extortion. *Docket Document No. 117.*

On March 7, 2005, we denied in part and granted in part Defendants' motion to dismiss. *Docket Document No. 115.* The following counts of the complaint survived Defendants' motion to dismiss: Count IV, alleging that Defendants schemed to fraudulently overcharge Triple–S subscribers for service co-payments and insurance premiums; Count VI, alleging that Defendants schemed to systematically deny and diminish payments due to network providers for services rendered to subscribers; Count VII, alleging that Defendants schemed to use Triple–S's market dominance and economic power to extort money and dissuade opposition of Defendants' fraudulent practices; and Count VIII, alleging that Defendant MC–21 denied payments and wrongfully charged network pharmacies and pharmacy consumers for drugs that should have been covered under insurance contract agreements. *Docket Document No. 117.* Counts VI, VI, and VIII were predicated on mail and wire fraud statute violations, 18 U.S.C. §§ 1341 and 1342 (2000 & Supp.2004); Count VII was predicated on Hobbs Act violations. 18 U.S.C. § 1951 (2000 & Supp.2004).

After conducting limited class-certification discovery, Plaintiffs moved for class certification on November 30, 2005. *Docket Document No. 149.* Defendants moved to compel arbitration on December 14, 2005. *Docket Document No. 158.*

On March 17, 2006, without deciding either pending motion but on the basis of arguments put forward by Defendants in opposition to class certification, we ordered Plaintiffs to show cause as to why summary judgment should not be awarded against them. *Docket Document No. 202.*

Our order was prompted by a concern that the limited class-certification discovery conducted by the parties strongly suggested that Plaintiffs can under no circumstances support the allegations sustaining this entire litigation: namely, that Defendants transmitted mail and wire communications in furtherance of a fraudulent scheme, in violation of the mail and wire fraud statutes, and extorted Plaintiffs in violation of the Hobbs Act. 18 U.S.C. §§ 1341, 1342, 1951.

In their compliance motion and sur-reply, Plaintiffs hotly contest the propriety of our order, and also attempt to demonstrate the existence of genuinely contested material facts sufficient to sustain this lawsuit. *Docket Document Nos. 205, 217.* Defendants oppose, eagerly supplying additional fodder in support of dismissal. *Docket Document No. 209.* For the reasons stated herein, we find that Plaintiffs are plainly incapable of putting forth the evidence necessary to sustain a RICO action predicated on either the mail and wire fraud statutes or the Hobbs Act, and so we grant summary judgment in Defendants' favor.

## II.

### *Standards and Propriety*

The standard for summary judgment is straightforward and well-established. A district court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004).

■ We are "widely acknowledged to possess the power to enter summary judgment[ ] *sua sponte,"* Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), so long as we have given Plaintiffs "appropriate notice and a chance to present [their] evidence on the essential elements of the case ..." *Berkovitz v. Home Box Office, Inc.,* 89 F.3d 24, 29 (1st Cir.1996). Although we clearly put Plaintiffs on notice through our order to show cause, *Docket Document No. 202,* Plaintiffs contend that we should not have done so before they have had an opportunity to engage in discovery on the case's merits. We disagree.

In the course of conducting extensive class-certification discovery, the parties have touched upon issues that bear directly on the case's merits, which, itself, is quite common. "[T]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963)). However, class-certification discovery in this case revealed with unusual clarity that Plaintiffs' claims are insufficient to support a cause of action. In subtle but fatefully important ways, Plaintiffs' claims as they have been revealed in recent pleadings and in deposition testimony differ and are inferior to the allegations in Counts IV and VI–VIII of the complaint, the only counts which were adequate to survive Defendants' motion to dismiss. *Docket Document No. 115.* The materials available to us now show unequivocally that Defendants did not engage in either mail and wire fraud or extortion in their dealings with Plaintiffs—both quintessentially "essential elements" to Plaintiffs' case. *Berkovitz,* 89 F.3d at 29. Although the parties have not engaged in full-scale discovery, this litigation

is "sufficiently advanced" to justify summary judgment in that there are no facts that Plaintiffs could conceivably uncover—or, at least, none consistent with the record before us—so impressive as to remedy the case's deficiencies. *Bank v. Int'l Business Machines Corp.*, 145 F.3d 420, 431 (1st Cir.1998); *see also Diaz v. City of Fitchburg*, 176 F.3d 560, 562 n. 2 (district court was justified in granting sua-sponte summary judgment because essential issue was a "question of law which does not depend on the development of further facts."). For this reason, we are justified in granting summary judgment sua sponte before the conclusion of discovery. Summary judgment exists "to pierce the boilerplate of the pleadings and assess the proof in order to determine the need for trial." *Euromodas, Inc. v. Zanella*, 368 F.3d 11, 17 (1st Cir.2004) (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)). We issued an order to show cause and are now awarding summary judgment because of our belief that Plaintiffs cannot "establish the existence of an element essential to [their] case": that Defendants committed the RICO predicates of either mail and wire fraud or extortion. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (When faced with summary judgment, "the plaintiff [can] not rest on his allegations . . . to get to a jury without 'any significant probative evidence tending to support the complaint.' ")(quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

## III.

### *Analysis*

### A. *Mail and Wire Fraud: Counts IV, VI & VIII*

■ The record before us clearly indicates that Plaintiffs' allegations of mail and wire fraud are unsupportable. Plaintiffs now concede that the mails and wires referenced in the complaint "could be innocent" in the sense that they are "true" and contain no misstatements or lies. *Docket Document No. 205.* Plaintiffs argue that the mail and wire fraud statutes are nonetheless implicated because the mails and wires facilitated Defendants' fraudulent scheme, which is so concealed that Plaintiffs are unable to conjecture as to its nature without first engaging in merits discovery. *Id.*

Plaintiffs' current posture stands in marked contrast to the position they convincingly took when arguing against Defendants' motion to dismiss: the content of the communications misled providers to believe they were being paid the correct tariffs and subscribers to believe they were being charged the correct co-payments. *Docket Document No. 95, Exh. C.*

We will proceed by first demonstrating how the class certification discovery materials reveal the original allegations to be unsupportable; and second, explaining how Plaintiffs' new and revised narrative as to how Defendants committed mail and wire fraud—a narrative that is at least consistent with the factual record—is insufficiently particularized to withstand Rule 9(b) scrutiny.

### 1. *Class Discovery Materials Render Allegations Unsupportable*

As we discussed in detail in the order to show cause, our review of class certification discovery materials suggested that the mails and wires Plaintiffs' received suffer from two deficiencies: (1) they differ materially from how they were described in the complaint; and (2) more critically, they cannot be considered as having been trans-

mitted in furtherance of a fraudulent scheme, as the concept is legally defined.[1] *Docket Document No. 202.*

### a. *Original Pleadings*

In their complaint, Plaintiffs allege that "for the purpose of executing and concealing the artifice" through which Defendants schemed to fraudulently overcharge and underpay the various Plaintiff classes, Defendants violated the mail and wire fraud statutes by commissioning hundreds of thousands of "requests for authorization, letters, contracts, bills, payments, [and] receipts," as well as "letters containing the new tariffs and billing policy, accounting statements, accounting records" and "drug prescriptions." *Docket Document No. 117,* ¶¶ *131, 170, 219.*

■ Our review of Defendants' motion to dismiss required us to contemplate "how FED. R. CIV. P. 9(b)'s special pleading requirement interacts with mail and wire fraud allegations under RICO," a thorny issue upon which the First Circuit has fortunately expounded. *New England Data Services, Inc. v. Becher,* F.2d 286, 288 (1st Cir.1987). The circuit court required RICO mail and wire fraud allegations to be plead with a degree of specifici-

ty "no more or less than we have required in general fraud and securities fraud cases," but discouraged lower courts from automatically dismissing deficient complaints when "the specific allegations of the plaintiff make it likely that the defendant used interstate mail or telecommunications facilities, and the specific information as to use is likely in the exclusive control of the defendant." 829 F.2d at 289–290. The *Becher* court instead suggested that lower courts provide plaintiffs the opportunity to amend their complaint after preliminary discovery.[2] *Id.*

Mindful of Rule 9(b)'s pleading requirements, Plaintiffs attached an exhibit to their response to Defendants' motion to dismiss dedicated entirely to explaining how the mail and wire fraud allegations were sufficiently particularized. *Docket Document No. 95, Exh. C.* As to the content of the communications for Counts IV and VI, Plaintiffs alleged: "At all times through their communications with the plaintiff classes the defendants misled them to believe that SSS was charging [Plaintiff Subscribers] the correct premium or tariff ... [and] paying [Plaintiff Providers] the correct tariffs...." *Id.*

---

1. Plaintiffs are correct in pointing out that some language in our order incorrectly expressed the standard by which mail and wire fraud is to be plead: the communications themselves need not be fraudulent, and injury need not arise directly through receipt of the communications. *Docket Document No. 205.* Nevertheless, as we discuss in detail herein, the concerns raised in our order are equally valid according to the proper standards.

2. Courts have not interpreted *Becher* so loosely as to give plaintiffs an automatic right to discovery before shouldering their burden to plead with Rule 9(b) particularity. Rather, preliminary discovery is only allowed when the complaint asserts that specific details are in defendants' exclusive control. *See N. Bridge Assoc., Inc. v. Boldt,* 274 F.3d 38, 43–44 (1st Cir.2001)(finding that "district court

was not obliged to give [plaintiffs] a second chance" to construct a RICO claim after engaging in preliminary discovery because "complaint does not present 'specific allegations' of ... mail or wire fraud episodes whose details could be expected to be exclusively within the defendants' knowledge."); *Ahmed v. Rosenblatt,* 118 F.3d 886, 889–90 (1st Cir.1997)(noting that application of *Becher* "second determination" approach is "neither automatic, nor of right, for every plaintiff"). *Becher* therefore in no way lessens the strength of the rule that it "is not enough for a plaintiff to file a RICO claim, chant the statutory mantra, and leave the identification of predicate acts to the time of trial." *Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 42–43 (1st Cir.1991).

Plaintiffs' amended Count VIII put forward specific examples of mail and wire fraud, including: (1) Defendant MC–21's insurance claim rejection letters that were transmitted to the Plaintiff pharmacy owner sub-class; (2) reimbursement checks that were improperly discounted; (3) coercive circulars requiring contract acceptance and detailing compensation plans; and (4) circulars declaring Defendant MC–21's intention to cover only generic drugs. *Docket Document No. 117,* ¶ *222.*

We denied in part Defendants' motion to dismiss, concluding that the complaint satisfied Rule 9(b)'s particularity requirement. *Docket Document Nos. 115, 119.* In finding the mail and wire fraud allegations adequate, we interpreted them as asserting that mailings were sent "for the purpose of executing [the fraudulent] scheme." 18 U.S.C. § 1341; *see also Amrak Prods., Inc. v. Morton,* 410 F.3d 69, 72 (1st Cir.2005)(factual allegations are accepted as true and all reasonable inferences are drawn in plaintiffs' favor); *United States v. Serino,* 835 F.2d 924, 928 (1st Cir.1987)(noting that First Circuit, in accord with other courts, has "given a liberal construction" to mail fraud statute's language).

### b. *Class Certification Discovery Materials*

Class certification discovery, though intentionally limited in scope, has made crystal clear that mail and wire fraud were not used in furtherance of the scheme, even if such an elusive scheme exists. The mails and wires that Plaintiffs received as they were described in deposition are the exact opposite of what they were represented to be in the complaint, and fall on the very opposite side of the line delineated in *United States v. Pacheco–Ortiz,* 889 F.2d 301, 305 (1st Cir.1989), in which the First Circuit announced how to determine whether a particular mail or wire trans-mission was in furtherance of a fraudulent scheme:

> Within the mail fraud statute as furthering the illegal scheme are those mailings that: assist the criminal in carrying out the fraud; or delay discovery of the fraud.... [O]utside the statute as not furthering the illegal scheme are those mailings that: serve to put the defrauded party on notice regarding the fraud; make the execution of the fraud less likely; oppose the scheme; or disclose the nature of the fraud.

889 F.2d at 305 (quoting *United States v. Leyden,* 842 F.2d 1026, 1028–1030 (8th Cir. 1988)).

When Plaintiffs claimed, in opposing Defendants' motion to dismiss, that their fraud allegations were particularized, they pointed specifically to EOBs, EOPs, and other communications that allegedly "misled" them into believing they were receiving the correct payments and benefits from Triple–S. *Docket Document Nos. 95, 117.* Now, not one of the twelve deponents in this case can recall receiving a mail or wire that they can plausibly describe as misleading, instrumental in defrauding them, or even that "conceal[ed] ... the actual manner in which payments [or benefits] were processed," as alleged in the complaint. *Docket Document No. 117.*

Instead, these communications were the very catalyst through which Plaintiffs became apprised of the allegedly fraudulent scheme. Time and again, in deposition, Plaintiffs admitted that the communications explained how a particular "payment was going to be lowered" and exactly "what was going to happen to [a] claim." *Docket Document No. 157, Exh. 6, pp. 84– 85.* There was "no secret": the EOPs contained "nothing hidden" or "concealed." *Id., Exh. 8, pp. 37, 68, 84–85.* Plaintiffs "noticed" Defendants' objectionable practices "through the EOPs" themselves. *Id., p. 68.* Defendants clearly disclosed how

and what they were charging in relation to the claim submission process for Plaintiff Pharmacists. *Docket Document No. 183, p. 224.* "The information [Defendants] gave in the circular letters" alerted Plaintiffs to the allegedly fraudulent behavior. *Docket Document No. 157, Exh. 13, p. 48.* Documents received by Plaintiff Subscribers included "[EOBs] describing the procedures performed and what services had been covered in a time period" and "letters . . . informing of any changes in the coverage or other pertinent information." *Docket Document No. 205, Exh. 3, ¶ 3.* EOPs received by Plaintiff Providers "include reports of denied claims . . . [and] reimbursement checks." *Id., Exh. 11, ¶ 12.* Monthly statements for capitation providers "showed all charges charged against the capitation including inappropriate charges." *Id.*, Exh. 6, ¶ 4.

Further discovery cannot aid Plaintiffs' cause. Because the allegations clearly asserted that the communications mailed and wired in furtherance of the fraudulent scheme were transmitted directly to Plaintiffs, *Becher's* "second determination" approach is not and never has been available here; any communications transmitted in furtherance of a fraud scheme necessarily must be (or must have been) in Plaintiffs' possession. *Ahmed,* 118 F.3d at 889–90. As Plaintiffs were not entitled to preliminary discovery before satisfying Rule 9(b)'s pleading requirements, the case's viability moving forward depends on the original allegations' continued resistance to at least the mildest scrutiny. Plaintiffs now contradict those allegations, and so there is no legal basis through which they can lay claim to continued discovery. They are empty-handed.

### 2. *Plaintiffs' New Characterization of the Mail & Wire Fraud Allegations*

██ Plaintiffs now freely admit that the EOPs, EOBs, circulars, and remittances referenced in the complaint and in opposition to Defendants' motion to dismiss did not contain any misleading information, and in fact alerted Plaintiff Providers as to the possibility that they were not getting paid to the extent they feel entitled. *Docket Document No. 205* (conceding that "there is nothing inherently false" in the transmissions); *see also Id., Exh. 1, ¶ 26* ("the documents received [are] not fraudulent on their face"). Plaintiffs' new position is that the mail and wire communications were not necessarily misleading, but nevertheless were sent in furtherance of fraudulent scheme, therefore implicating the mail and wire fraud statutes. *Id.*

██ While "no misrepresentation of fact is required in order to establish a scheme to defraud . . . not every use of the mails or wires in furtherance of an unlawful scheme to deprive another of property constitutes mail or wire fraud." *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990). In order to stick, mail and wire fraud allegations must at least "assist the criminal in carrying out the fraud . . . or delay discovery of the fraud." *Pacheco-Ortiz.* 889 F.2d at 305. A mailing "need not be . . . connected with the essence of the fraud . . . so long as it is 'incident to an essential element of the fraud.'" *United States v. Pimental,* 380 F.3d 575, 587 (1st Cir.2004)(quoting *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)); *see also Serino,* 835 F.2d at 928–29 ("As long as the mailings are sufficiently related to the scheme so that the execution of the scheme depended on those mailings being sent, the proper nexus is established."). Since Plaintiffs no longer aver that the mails and wires were, themselves, misleading, their new position could be tenable only if ac-

companied by a particularized description of the scheme and how the communications, though facially innocent, furthered the scheme. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.,* 48 F.3d 1066, 1070 n. 6 (8th Cir.1995)("In a case of mail or wire fraud that does not involve a misrepresentation of fact, the circumstances [that must be stated with particularity] ... consist of four elements: (1) a scheme to defraud; (2) intent to defraud; (3) reasonable foreseeability that the mails (or wires) would be used; and (4) use of the mails (or wires) in furtherance of the scheme."). Plaintiffs' new characterization of the complaint must fail because it is unsuccessful in describing either the scheme or how the mails were used in furtherance of the scheme.

### a. *The Scheme*

Plaintiffs' underlying motivation in bringing this case is that they detest the way in which Defendants Triple–S and MC–21 calculate provider payments and subscriber benefits, and allege that the manner in which providers are consistently underpaid and subscribers under-served amounts to a scheme to defraud. *Docket Document Nos. 95, 117, 149, 205.* But Plaintiffs have been demure in describing anything useful about the fraudulent scheme: how it functions, why it is fraudulent, or what makes it a scheme. Instead, they broadly assert that "[a] lay person ... cannot understand the underlying Triple–S/MC–21 scheme to defraud because of its complexity." *Docket Document No. 205.* Even according to Plaintiffs' experts, who have been proffered for the very purpose of testifying to the scheme's nature, "there is no way to know the specifics of the scheme." *Id.* In the final analysis, the scheme is something that Plaintiffs merely "reasonably suspect but cannot prove until merits discovery." *Id.* This description is paradigmatically antithetical to Rule 9(b)'s

requirement that "[i] n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."

### b. *Mails and Wires Used in Furtherance of the Scheme*

In response to our order to show cause, Plaintiffs enumerate the ways in which mail and wire communications were used in furtherance of a scheme to defraud:

> Plaintiffs have received ... Explanation of Benefits ("EOBs") [and, in Plaintiff Providers' case, Explanation of Payments ("EOPs") ] and letters informing Plaintiffs of changes in coverage [and payment policy] .... claim remittance forms .... monthly capitation statement[s] which showed all charges against the capitation including the inappropriate [deductions].... [M]onthly statements [and checks] reimbursing the inappropriate charges made to the capitation in previous months ... routine transmission ... of approval or denial of [sic] catastrophic injuries ... transmissions by which ... claims are processed and which detail how Triple–S improperly denies claims.... [C]ircular letters concerning additions or deletions of CPT codes, formularies, or payment policies.... Provider Manuals.

*Docket Document No. 205.* As explained by the named Plaintiffs who received them, and understood in a light most favorable to Plaintiffs' cause, the communications simply do not fit the bill for mail or wire fraud because they did not fraudulently induce Plaintiffs, but instead tipped them off to the possibility that Triple–S was short-changing them.

Plaintiffs' experts now assert that "important information regarding the scheme is omitted from these documents," then quickly qualify this vague aspersion by

stating that "the time and resources needed to go through these documents would be overwhelming and a substantial hardship." *Id., Exhs. 1, ¶ 38; 2, ¶ 38.* This allegation is echoed in Plaintiffs' sur-reply to the order to show cause, in which they aver that the EOPs "do not disclose the process by which Defendants arrive at their decisions." *Docket Document No. 217.* In the absence of a clear depiction of the scheme, this averment is useless in helping us understand the communications' relation to the fraud.

█ Plaintiffs could be construed as alleging that Defendants have breached their agreements with Plaintiff Providers and Subscribers. *Docket Document No. 205, Exh. 1, ¶ 10* ("Triple–S pays ... a lower rate than the contract rate agreed upon in the contract."). But in the absence of some "calculated misstatement or perversion of truth, trickery, or other deception" in the mails or wires, breach of contract, in itself, does not constitute mail or wire fraud even if mails and wires were used in implementing the contract breach. *Id.* (citing *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980)) ("[T]he [mail and wire fraud] statute[s] do[ ] not reject all business practices that do not fulfill expectations, nor do[ ] [they] taint every breach of a business contract."); Websters Third International Dictionary (defining "fraud"). The allegation that the EOPs "do not disclose the process by which Defendants arrive at their decisions" is so vague and uninstructive that it simply does not support a claim for an omission triggering the mail and wire fraud statutes. *Docket Document No. 217.* Similarly unavailing are Plaintiffs' allegations that Defendants arbitrarily: (1) denied drug and procedure claims; (2) imposed excessive waiting periods for approving special coverages and stop loss claims for IPAs; and (3) arbitrarily deprived IPAs of capitation payments and laboratories of test reimbursements; because Plaintiffs are unable to describe how the mails and wires furthered the scheme, the mail and wire fraud statutes are not successfully invoked. *Docket Document No. 205, Exh. 1, ¶ 22.*

### c. *Our Disposition of Plaintiffs' New Approach*

Plaintiffs' new characterization of the complaint allows us to understand it as alleging: "(1) A fraudulent scheme exists and (2) mails and wires were used to facilitate the scheme. Even though (3) the mails and wires themselves did not contain any falsities or deceptions, (4) they must have been misleading because (5) they did not reveal the true nature of the scheme, (6) the nature of which will become clearer at a later date." Accepting Plaintiffs' assurances that the mails and wires must have been misleading because they conceal the fraudulent scheme would require us to take an unacceptable leap of faith in taking their word that a fraudulent scheme exists. *See Hayduk v. Lanna,* 775 F.2d 441, 443 (1st Cir.1985)("[I]n cases in which fraud lies at the core of the action, the rule does not permit a complainant to file suit first, and subsequently search for a cause of action.").

Therefore, even if were to accept Plaintiffs' new approach as an amended complaint, we would be justified in dismissing it immediately as totally non-responsive to the applicable pleading requirements. *See Murr Plumbing,* 48 F.3d at 1070.("A district court may enter summary judgment dismissing a complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b)."). Whether the communications in question were mails and wires sent in furtherance of a scheme to defraud is "a question of law which does not depend on the development of further facts." *Diaz,* 176 F.3d at 562 n. 2.

Accordingly, summary judgment is granted in Defendants' favor as to Counts IV, VI, and VIII.

## B. *Hobbs Act—Extortion*

■ Count VII is predicated on the Hobbs Act, which defines extortion as "the obtaining of property of another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official light." 18 U.S.C. § 1951. Plaintiffs insist that Defendants schemed to extort them by subjecting them to fear of economic loss, threatening them with: (1) exclusion from the health plan networks administered by Triple–S; (2) discriminatory audits under manipulative accounting procedures; (3) payment withholdings justified by the manipulated audit results; and (4) denial of patient referrals. *Docket Document No. 117.* We look first to the second and third enumerated allegations, pertaining to audits, and then assess the viability of Plaintiffs' claims relating to loss of business and network exclusion.

### 1. *Audits and Audit–Related Payment Withholdings*

The purported class representatives did not testify to having been threatened in any way consistent with the Count VII allegations regarding audits and payment withholdings based on those audits. Dr. Allende testified that he was never threatened with an audit by Triple–S. *Docket Document No. 157, Exh. 6, pp. 71–72.* Dr. Asparo, Dr. Zayas, and Dr. Ortiz all stated that they had never been audited or threatened in any way by Triple–S, *Id., Exh. 7, p. 51; Exh. 8, p. 40; Exh. 9, p. 140,* though Dr. Ortiz later reversed this assertion in an unsworn affidavit. *Docket Document No. 205, Exh. 13, ¶ 10.* Mr. Martínez testified that neither he nor his laboratory had ever been threatened.

*Docket Document No. 157, Exh. 10, p. 101.* Both Ms. Rolón and Ms. Rodríguez testified that they had never been threatened. *Id., Exh. 11, pp. 69–70; Exh. 12, pp. 92, 96.* Mr. Sánchez testified that he had never been threatened with an audit or its consequences. *Id., Exh. 13, p. 72–73.* Dr. Robledo testified that neither he nor, to his knowledge, his corporation had ever been threatened. *Id., Exh. 4, pp. 101–04.*

In short, no materials procured through merits discovery can undo the fact that the named representatives all testify (with the sole exception of Dr. Ortiz, who gave two conflicting accounts) that they were not threatened, as alleged in the complaint, with audits or payment withholdings based on audit results. Plaintiffs have attempted to mitigate the impact of this alarming deficiency in their case with: (1) unsworn declarations of Plaintiffs' proffered experts, José Ramón González and Antonio O. Marrero that it is their "understanding that Defendants use their audit practices in an abusive manner as a means of forcing the providers to accept unilateral changes to the contract. . . ." *Docket Document No. 205, Exhs. 1 & 2, ¶ 17,* and (2) signed affidavits from the purported class representatives, all of which state in identical language that "Triple–S [and MC–21] use[ their] . . . audit power in an arbitrary and retaliatory manner There is a general knowledge around the industry that audits are performed as a fishing expedition which creates a substantial inconvenience to providers." *Id., Exhs. 5, 7, 10, 11, 12, 14.* Significantly, the affidavits' language makes no attempt at suggesting that the affiants personally experienced such threats.

Left only with these self-serving, impossibly vague and unsupported declarations, we cannot in good conscience allow the allegations to go forward when none of the named plaintiffs personally take responsi-

bility for them in a consistent manner. The very least that can be said is that Plaintiffs lack standing to bring claims for which they suffered no harm. Plaintiffs enjoy RICO "only if [they] can demonstrate (1) a violation of section 1962, and (2) harm 'by reason of' the violation." *Willis v. Lipton*, 947 F.2d 998, 1000 (1st Cir.1991)(internal quotations excluded); 18 U.S.C. § 1964(c). None of the named Plaintiffs claim to have been harmed through audit threats; hence they have no standing to bring those claims. *See N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir.1996)(noting that the complaining party must satisfy Article III test for standing "throughout the litigation, not just at the moment when the complaint is filed").

Even if Plaintiffs had standing to bring the audit-related extortion claims—and here we can give the benefit of the doubt to Dr. Ortíz, whose unsworn affidavit contradicted her sworn deposition testimony with the unsupported assertion that she "was once threatened with an audit"—the claims are not actionable because Plaintiffs had no "pre-existing statutory right" to be free from audits—an issue that we explore in greater detail below. *George Lussier Enters. v. Subaru of New England, Inc.*, 393 F.3d 36, 50 (1st Cir.2004). In fact, Triple–S's contract with the providers explicitly authorizes the use of audits and stipulates that the Triple–S Board of Directors "may cancel the contract of that participating doctor who does not allow, prevents, or hinders an audit." *Docket Document No. 160, Exh. B, p. 31.*

### 2. *Whether The Remaining Extortion Claims Are Actionable*

■ Mr. Varela testified that he had been threatened with being expelled from MC–21's and/or Triple–S's private contract agreement if he did not also sign a con-

tract for the public contract, known as "the Reform." *Docket Document No. 183, pp. 184–187.* Although Ms. Rolón testified in deposition that she had never been threatened by Triple–S, in a subsequently admitted affidavit she claimed that her laboratory had been threatened with a contract cancellation unless she accepted changes to the contract terms. *Docket Document No. 205, Exh. 9, ¶ 10.* Mr. Sánchez testified to Triple–S's "take it or leave it" approach: "either you take the payments the way they are, or [they] just cancel the contract so you stay out of the system." *Docket Document No. 157, Exh. 13, p. 74.* Dr. Allende testified to being threatened in the sense that Triple–S would refuse to reimburse him for a medical procedure associated with a particular code number ("CPT code"), but would instead reimburse him at a rate associated with a lower CPT code, unless he submitted evidence showing that he performed a more advanced procedure corresponding with the higher coding level. *Docket Document No. 157, Exh. 6, p. 72.*

■ We do not find these allegations, premised on the assertion that Defendants used economic fear to force their will on Plaintiff providers, actionable. "[E]xtortion of money induced by fear of economic loss" is actionable, *United States v. Hathaway*, 534 F.2d 386, 393 (1976), but only "if the plaintiff had a pre-existing statutory right to be free from the defendant's demand." *George Lussier Enters.*, 393 F.3d at 50; *see also United States v. Cruzado-Laureano*, 404 F.3d 470, 481 (1st Cir. 2005). Indeed, "the fear of economic loss is a driving force of our economy that plays an important role in many business transactions." *George Lussier Enters.*, 393 F.3d at 50 (quoting *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir.1998)). Plaintiffs have no pre-existing statutory right to be

Triple–S network providers or to receive Triple–S' referrals, and hence have no property interest on which to base their claims. *George Lussier Enters.*, 393 F.3d at 50 (conditioning car dealers' access to vehicles on acceptance of distributors' conditions "does not amount to a wrongful demand to constitute a component of coercion"); *Brokerage Concepts*, 140 F.3d at 526 (Healthcare insurance company's refusal to include pharmacy in provider network because pharmacy failed to accept conditions of inclusion constitutes "an example of hard bargaining rather than extortion."); *United States v. Sturm*, 870 F.2d 769, 773 (1st Cir.1989) ("[F] or the purposes of the Hobbs Act, the use of legitimate economic threats to obtain property is wrongful only if the defendant has no claim of right to that property."); *Robert Suris Gen. Contractor Corp. v. New Metro. Fed. Sav. & Loan Ass'n*, 873 F.2d 1401, 1405 (11th Cir.1989) (Successful extortion theory requires that "fear of economic loss is separate and distinct from performance on the contract"; claim cannot be maintained when the "only fear of economic loss is that which accompanies any party to a contract when he suspects that compliance and compensation may not be forthcoming."); *Koerpel v. Heckler*, 797 F.2d 858, 863 (10th Cir.1986)(holding that medical provider had no property interest in inclusion in Medicare reimbursement plan: "A mere expectation of entitlement is insufficient to create a property right.").

The tactics alleged by Dr. Allende and Mssrs. Varela, Sánchez and Rolón constitute, at most, "lawful hard-bargaining" and, therefore, do not support a Hobbs Act claim for relief. *George Lussier Enters.*, 393 F.3d at 51. We are not persuaded by Plaintiffs' insistence that Triple–S's "overwhelming market dominance" pushes their bargaining tactics into the pale of unlawful coercion. *Docket Document No. 205.* The only case Plaintiffs' cite in support of this ambitious theory is *Brokerage Concepts*, in which the court suggested, in dicta, that antitrust laws could be potentially implicated if a monopolistic power exerted undue influence over its customers. 140 F.3d at 526 n. 23. As Plaintiffs fail to allege antitrust violations as a part of their RICO suit, we find *Brokerage Concepts'* footnoted dicta on antitrust suits to be inapposite. We have found no legal authority for the proposition that the § 1951 definition of extortion expands according to the size and influence of the alleged extortionist. To the contrary, we point to *Koerpel*, in which the court found that a doctor did not have a property interest in Medicare reimbursements, notwithstanding the doctor's almost complete reliance on his status as a Medicare provider for his livelihood. 797 F.2d at 860. We do not welcome this case as an opportunity to expound a new theory of law pertaining to extortion cases, and so do not find the allegation that Triple–S is a monopoly to be relevant to Plaintiffs' Hobbs Act claims. We therefore find that Plaintiffs's count VII extortion allegations are unsupportable.

## IV.

### Conclusion

Plaintiffs' RICO claims are predicated on allegations that Defendants violated the mail and wire statutes and the Hobbs Act. *Docket Document No. 117;* 18 U.S.C. §§ 1341, 1342, 1951. However, Plaintiffs' contention that Defendants committed RICO predicate violations is clearly unsupportable at trial.

In accordance with the foregoing, we award summary judgment in Defendants' favor. Plaintiffs' RICO claims are **DISMISSED**. Judgment to be entered accordingly.

**IT IS SO ORDERED.**